### In re BECK–RUMBAUGH ASSOCIATES, INC. Debtor.

#### Bankruptcy No. 85–00917S.

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 4, 1989.

See also, D.C., 97 B.R. 182.

Anthony Barone, Philadelphia, Pa., trustee.

Edward Cohen, Philadelphia, Pa., for debtor.

Fred Lowenschuss, Philadelphia, Pa., for Robert Rumbaugh.

Edward J. DiDonato, David S. Fishbone, Paul J. Winterhalter, Philadelphia, Pa., for trustee.

Paul I. Guest, Jr., King of Prussia, Pa., for Joseph Chandler.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The time has come for us to bring to a conclusion the bankruptcy court phase of the disputes between Robert Rumbaugh (hereinafter "R") and Norman H. Beck, Jr. (hereinafter "B") arising out of the 1979 dissolution of the Debtor, a corporate office supply representative business of which B at that time owned fifty-one (51%) percent of the stock and R owned the remaining forty-nine (49%) percent. Because we believe that a 1988 confessed judgment by one Joseph Chandler (hereinafter "C") was entered and executed upon as a result of collusion between B and C to deprive R of the fruits of a federal judgment entered in his favor against B after a jury verdict, we hold that C's judgment must be subordinated to that of R. Therefore, we conclude that R is entitled to the entire balance of $140,476.64 available in the estate for distribution.

The history of this corporate chapter 7 case involving a solvent Debtor, filed on March 13, 1985, is set forth in our previous published Opinion at 68 B.R. 882, 883–84, 886–87 (Bankr.E.D.Pa.1987), aff'd, 84 B.R. 369 (E.D.Pa.1988). In that Opinion, we identified three pieces of litigation between R and B arising out of the corporate Debtor's dissolution, apart from but related to the litigation in this court. The first action, initiated in the local federal district court in 1979 at C.A. No. 79–3849 (hereinafter "the Federal Action"), resulted in a judgment of the district court, per the Honorable John B. Hannum, after a jury verdict, on January 10, 1983. In ruling on post-trial motions, the district court, on July 27, 1987, amended its judgment in favor of R against B, individually, allowing for a recovery in the amount of $163,703.99 pursuant to a claim based upon B's breach of an agreement to buy out R's forty-nine (49%) percent interest in the Debtor. However, the decision also held that R was required to deposit his stock in the Debtor into court as a condition of execution on this judgment, thereby precluding a double recovery in favor of R. Also reaffirmed were additional awards in favor of R against B for an additional $5,000.00; and an award in favor of R in the amount of $28,000.00 against the Debtor; and an $8,154.00 counterclaim in favor of the Debtor against R. On R's appeal, the Third Circuit Court of Appeals affirmed this decision on February 3, 1988, in No. 87–1509.

The second action, instituted at October Term, 1984, No. 1943 in the Philadelphia Court of Common Pleas, see 68 B.R. at 887 (hereinafter "the Philadelphia Action"), was briefly touched upon by us when C relisted his previously-pending motion to enforce the automatic stay and prevent that action from proceeding. We denied this motion as to all non-debtor entities in an Order of February 2, 1988.

In the course of the matters presently before us, we learned that the Philadelphia Action had been tried before the Honorable Paul Ribner in May, 1988, but remained under advisement. The transcript of this entire trial was admitted into the record here. Basically, the Philadelphia Action was initiated by R and sought monetary damages from B, B's wife, C, and several other individuals on the ground that all of them conspired to prevent R from receiving his share of the proceeds from the dissolution of the Debtor, principally by placing two allegedly fraudulent mortgages against a Florida condominium owned by the Debtor.

On August 2, 1988, this court and the Honorable Norma L. Shapiro of the local federal district court presided together over a status hearing of this case and of the third action, Misc. 86–73NS, an interpleader proceeding removed from the New Jersey courts which remained before her (hereinafter "the Interpleader Action"). See 68 B.R. at 887. Thereafter, we entered an Order directing the Trustee to file any Objections to Proofs of Claims filed in this case on or before August 26, 1988, and scheduled a hearing on any Objections filed on September 28, 1988. On August 25, 1988, the Trustee filed Objections to all ten (10) Proofs of Claims lodged in this case. By Orders of September 28, 1988, and November 31, 1988, we disallowed all but Claim 5, filed by R, which we reduced to a net amount of $12,397.84, after taking into account the Debtor's judgment on its counterclaim against R. We held that R's attempts to make other claims against the estate to satisfy his judgment against B,

which was the substance of his other proof of claim, was in fact a "proof of interest" see 11 U.S.C. § 501(a), which could be asserted as to his right to distribution of the estate's proceeds only. We also note that we conducted a lengthy hearing on September 28, 1988, on the Trustee's objection to a claim of C against the Debtor for sums loaned by him to B personally, ostensibly for the benefit of the Debtor. At the close of the hearing, at which B was the only witness for C, we denied C's claim in its entirety.

We also note that, in October, 1988, C attempted to serve garnishment papers upon·the Trustee and upon the Clerk of this Court in order to execute upon whatever sums B was due personally from distribution of this estate on the basis of a confessed judgment which he had obtained against B in the Chester County, Pennsylvania, Court of Common Pleas, at No. 88–07637 (hereinafter "the Chester Action"), on October 4, 1988. We declared the attempted garnishment null and void by a *sua sponte* order of October 18, 1988. On December 1, 1988, in refusing to reconsider this decision, we noted that our Clerk, as a representative of a federal instrumentality, was immune from a state-court garnishment. *See, e.g., Clarise Sportswear Co. v. U & W Mfg. Co.*, 223 F.Supp. 961 (E.D.Pa. 1963); 9 GOODRICH–AMRAM 2d, § 3101(b): 1.1, at 39 (1977). We also stated that any action by C to attempt to garnish any proposed distribution from this estate due to Beck was premature, and could be raised, if ever, only at the time that any distribution of estate proceeds to B was contemplated.

On February 27, 1989, Judge Shapiro resolved the Interpleader Action in a decision reported at 97 B.R. 182. Therein, she concluded, *id.* at 186, that the interpleaded funds of $184,384.08 were an asset of the Debtor and must be turned over to the Trustee; that R had a valid judgment against B of $140,109, plus interest from January 10, 1983, "that is a lien on Beck's interest in the Debtor corporation;" and

that R had a valid judgment against the Debtor of $19,846 plus interest from January 10, 1983.[1]

Believing that all substantive matters except distribution of the Debtor's assets were resolved upon Judge Shapiro's rendering this decision, we directed the Trustee, in an Order of March 2, 1989, to prepare the papers necessary to conduct a final audit hearing for the Debtor's estate. After two hearings on objections of R to compensation requests from the Trustee, his counsel, and the Debtor's counsel, we entered Orders of May 16, 1989, allowing somewhat reduced figures to these parties. R appealed certain of these awards. We nevertheless directed the Trustee to prepare a proposed Order for Final Distribution utilizing our figures and ultimately scheduled a hearing on same on June 21, 1989. R and C both filed "proofs of interest" in this case, each contending that he was entitled to priority over the other in distribution of proceeds of the estate otherwise payable to B. Each filed Objections to the "proof of interest" of the other. We set these matters down for a final hearing on July 24, 1989.

Several aspects of this matter are apparently uncontested. One is that the net balance in the hands of the Trustee available for distribution is $140,476.64. This figure is based upon the assumption that our Orders of May 16, 1989, will not be altered on appeal and that further efforts of the Trustee's counsel are not demanded which would justify additional compensation to him. R's $12,397.81 claim against the solvent estate entitles him to interest which will result in a total payment, first in priority, of over $15,000.[2] The judgment of R against B individually in the Federal

Action easily exceeds the remaining figure of about $125,000.

The entire case of C at the hearing of July 24, 1989, in support of his "proof of interest" consisted of submission of the General Docket and a Praecipe for Writ of Execution from the Chester Action and the Certificate of B's fifty-one (51) shares of the Debtor's stock, purportedly held by C. The Docket Entries and Praecipe verify the recording of a confessed judgment in favor of C against B in the amount of $101,-671.84, and issuance of the Writ of Execution to satisfy that judgment, all occurring on October 4, 1988. The stock certificate was produced to establish valid execution on same, since it was in C's possession.

C submitted a pre-hearing Memorandum in which he argued as follows: (1) By reason of the express terms of the judgment in the Federal Action, R is no longer a shareholder of the Debtor and his claim is simply that of a creditor of B; (2) R has never validly executed upon B's stock; (3) C has; and (4) Therefore, C is entitled to priority to R in the distribution process. The Trustee filed Explanatory Notes to his proposed Order of Distribution expressing general agreement with C's position, although allowing that the language of Judge Shapiro's Order indicating that R has a valid lien on B's interest casts some uncertainty on the validity of C's position.

After C rested his very short case, R then called C's attorney in this matter and the Philadelphia Action, Paul Guest; B's attorney in the Philadelphia Action, Michael Bomstein; and R himself as his witnesses. Admitted into evidence was, *inter alia*, the entire transcript of the Philadelphia Action trial. R offered depositions of C taken in connection with the Philadelphia Action into evidence. We reserved ruling

1. Since it was apparent that Judge Shapiro did not have the benefit of facts that R had garnished certain sums from the Debtor in post-judgment execution and been awarded a reduced bill of costs against the Debtor before her, we shall not alter the figure of $12,397.81, set forth in our Order of November 21, 1988, reflecting our computation of the same claim. Ultimately, the difference is immaterial, as we

conclude that all of the funds in the Trustee's hands must be distributed to R.

2. The Trustee, utilizing the interest formula of 28 U.S.C. § 1961, has computed the interest at $3,873.68. We note that, in *In re Shaffer Furniture Co.*, 68 B.R. 827, 831 (Bankr.E.D.Pa.1987), we utilized the lower state statutory rate of six (6%) percent. We need not resolve the issue as to the correct means of calculation, as we con-

on their admissibility.[3]

The substance of R's case was convoluted by three factors. The first was the rambling and often inconsistent testimony of R on cross-examination and then on redirect. Secondly was the "excessively adversarial approach" of R's counsel, Fred Lowenschuss, see 68 B.R. at 889, which prevailed throughout this hearing as well as the earlier hearings in this case and seemed to have spread to C's counsel, Mr. Guest, who periodically became loud, hostile, and argumentative during this hearing. Thirdly, however, was the simple fact that R was attempting to show collusion between B and C through purely circumstantial evidence. This is the only available means of proving this element when the parties charged with collusion have, as did B and C, some degree of sophistication, and absent themselves from the trial.

We find, as a matter of fact, that R has met his burden of proving that the entry of judgment in favor of C in the Chester Action was the product of collusion between B and C to deprive R of his right to collect his judgment from B. We observe that B and C were long-time friends, neighbors, and fellow country-club members. C was well aware of B's liabilities to R. The Federal Action judgment was entered before C ever made any loans or advances to

B. The level of animosity between R and B has, since 1979, been extremely high. The transaction involving the Florida condominium, the focus of the Philadelphia Action, certainly raised questions concerning the propensity of C to conspire with B in schemes to attempt to avoid satisfaction of the latter's liability to R. With some dismay, we note that the filing of the Chester Action involved a sequence of events similar to those challenged in the Philadelphia Action (an attempt by B to give C a prior interest in B's property, thereby placing C in a priority position to R). The entry of the Chester Action judgment thus appears to be a second attempt at the same gambit which was challenged in the Philadelphia Action. No actual liability of B to C was alleged or proven, either in the Chester Action or here. Nevertheless, B willingly allowed C to enter a substantial confessed judgment against him in the Chester Action and cooperated in permitting immediate execution in furtherance thereof against the one asset of B that was closely related to his dealings with R. Neither B nor C appeared at the instant hearing to rebut the rather clear accusations of collusion from R, even though very similar accusations had recently spread out by R in a comparable transaction in the lengthy Philadelphia

---

clude that R is entitled to the full distribution in any event.

**3.** These depositions were apparently offered as part of the testimonial record pursuant to Bankruptcy Rules 9014 and 7032 and Federal Rule of Civil Procedure (hereinafter "F.R.Civ.P.") 32(a)(2). While we believe that C was clearly "an adverse party," against whom R could use his depositions, we questioned whether depositions taken in a separate action in another court could be so used against him here. We note that the final paragraph of F.R.Civ.P. 32(a) expressly allows use of depositions taken in another proceeding in federal or state courts where the first action is dismissed and another action involving the same subject matter and parties is commenced. This rule has been interpreted as allowing depositions in a prior proceeding to be admissible in subsequent actions where "there is substantial identity of issues and parties." *Rule v. International Ass'n of Bridge ... Workers, etc.,* 568 F.2d 558, 568 (8th Cir.1978); and *Miwon, U.S.A., Inc. v. Crawford,* 629 F.Supp. 153, 154 n. 3 (S.D.N.Y.1985). *See also Fullerform Continuous Pipe Corp. v. American Pipe & Constr., Co.,* 44 F.R.D. 453, 455 (D.Ariz.1968); and M. VOLZ,

WEST'S FEDERAL PRACTICE MANUAL, § 8242, at 236 n. 56 (rev. 2d ed. 1979).

We believe the subject matter and parties of this proceeding and the Philadelphia Action are sufficiently similar to permit testimonial use here of C's depositions taken in the Philadelphia Action. The main players in both actions are/were R, B, and C. As here, R was alleging there that B and C collusively vested C with legal rights to allow B to evade satisfaction of his liability to R.

Also, we note that these depositions were admitted into the Philadelphia Action record, and we agreed to admit the entire Philadelphia Action record into the record here. Hence, we have already admitted them into our record here by implication.

We therefore conclude that C's depositions should be and hence will be admitted into the record here. However, since we were able to reach our decision without reviewing their contents at all, we have not read them nor have we taken their contents into consideration in rendering our decision.

Action trial, and hence R's contentions were well known to them. C chose instead, in this proceeding, to rest solely upon the bare presentation of evidence showing the entry of judgment and execution upon B's stock in the Chester Action. He then contends, under principles of comity and/or *res judicata*, this bankruptcy court is bound to accept the priority which B has manipulated his affairs to allegedly provide to C under principles of state law.

At the outset, we note flaws on the face of the Chester Action judgment and the execution process used there. The judgment was entered by confession, which we have held is, on its face, a unconstitutional process. *See In re Souders*, 75 B.R. 427, 433–38 (Bankr.E.D.Pa.1987). *Cf. In re Sharp*, 24 B.R. 817, 818–19 (Bankr.E.D.Pa. 1982) (bankruptcy court has power to refuse to recognize an invalid state-court judgment). Secondly, to validly levy against the stock certificate in issue, it was required that the executing officer (here, the Chester County sheriff) seize the stock. *See* 13 Pa.C.S. § 8317(a); *In re Railroad Dynamics, Inc.*, 97 B.R. 239, 245 (Bankr.E. D.Pa.1989); and 12 STANDARD PA. PRAC.2d 455–56 (1983). There is no sheriff's return noted in the record here. It appears, rather, that B simply handed the certificates over to C or his counsel in furtherance of an invalid "self-help execution." *Cf. In re B. Cohen & Sons Caterers, Inc.*, 97 B.R. 808, 814–16 (Bankr.E.D. Pa.1989).

We recognize that, here, B, the "victimized" judgment debtor, is not contesting the validity of the judgment and execution against him by the judgment creditor. However, we could hardly expect him to do so if he were in collusion with C to allow this judgment to be entered and used against R. We believe that the use of confession process, especially given its swiftness, was another manifestation of the collusion of B and C to effect a means of keeping recovery of B's interest in the Debtor away from R. The attempted garnishment against the Trustee and the Clerk of this Court was another manifestation of such collusion between B and C.

The conclusivity of the Chester Action judgment upon this bankruptcy court is expressly opened to our consideration by the venerable unanimous decision of the Supreme Court in *Pepper v. Litton*, 308 U.S. 295, 303–06, 310–12, 60 S.Ct. 238, 243–45, 246–48, 84 L.Ed. 281 (1939). There, the Court considered the proof of claim of an insider of the debtor corporation which was based upon a confessed judgment which the Court found had been entered in his favor for the sole purpose of avoiding the claim of a legitimate creditor. In subordinating the insider's claim to that of the creditor, the Court stated as follows, *id.* at 304–05, 306, 60 S.Ct. at 244–45, 245:

> The bankruptcy courts have exercised ... equitable powers in passing on a wide range of problems arising out of the administration of bankruptcy estates. They have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.
>
> .    .    .    .    .
>
> That equitable power also exists in passing on claims presented by an officer, director, or stockholder in the bankruptcy proceedings of his corporation. The mere fact that an officer, director, or stockholder has a claim against his bankrupt corporation or that he has reduced that claim to judgment does not mean that the bankruptcy court must accord it pari passu treatment with the claims of other creditors. Its disallowance or subordination may be necessitated by certain cardinal principles of equity jurisprudence (footnote omitted).

The principles thus set forth in *Pepper* have frequently been reiterated. *See, e.g., Browning v. Navarro*, 826 F.2d 335, 342 (5th Cir.1987); *Kelleran v. Andrijevic*, 825 F.2d 692, 694 (2d Cir.1987), *cert. denied*, 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988); *In re Century Vault Co.*, 416 F.2d 1035, 1039–40 (3d Cir.1969); *Margolis v. Nazareth Fair Grounds & Farmers Market*, 249 F.2d 221, 223–25 (2d Cir.1957); *Landmark Finance Corp. v. Cox*, 2 B.R. 739, 741–42 (S.D.Ga.1980); *In re Garafa-*

*no,* 99 B.R. 624, 630–32 (Bankr.E.D.Pa. 1989); *In re Fill,* 82 B.R. 200, 216–18 (Bankr.S.D.N.Y.1987); and *In re Lockwood,* 14 B.R. 374, 377–80 (Bankr.E.D.N.Y. 1981).

Particularly comparable to the facts of the instant proceeding are those in *Margolis, supra;* and *Fill, supra.* As in *Pepper,* the *Margolis* court refused to allow a confessed judgment obtained against a debtor by an insider to have priority over the claim of a legitimate creditor. *Fill* involved a trustee's attempt to invalidate a transfer of assets by an individual debtor to his former mother-in-law. There was apparently no question that the former mother-in-law did in fact advance sums equal to the sum transferred to her by the debtor. 82 B.R. at 204–05. Also, the mother-in-law obtained a judgment, which she claimed validated the transfer to her, in a proceeding which did not involve a confessed judgment and took five (5) months to litigate. *Id.* at 213. However, the court compared the speed with which the judgment was entered by default in that proceeding to that of the *Fill* debtor's tenacious defense of a suit against him by another creditor, *id.* at 208–09, 213, and the debtor's admission that he wanted to pay his mother-in-law first. *Id.* at 213. Considering these factors, it refused to accept the state-court judgment in the mother-in-law as conclusive of her rights.

Comparison of the course of B's defense of R's claim against him as opposed to his non-defense of C's alleged claim against him establishes that, here, the distinction is more pronounced than that between the relative treatment of his creditors by the *Fill* debtor. Here, B has vigorously opposed R's claims for ten (10) years. Meanwhile, B allowed C to obtain judgment against him and execute upon his stock certificate within a single day. *Fill* establishes that the favored creditor need not be a corporate insider. It was apparent in litigation of C's claim against the Debtor, where B was C's witness, as well as their cooperation in defense of the Philadelphia Action, that B and C were working in concert, and that a propensity for collusion existed. Moreover, here, R's position as a

judgment creditor is more well-established than the allegedly disfavored creditors in *Pepper, Margolis,* and *Fill.* He has already obtained a judgment against B, and B's dealings with C did not *begin* until *after* the judgment was entered.

According R a priority in distribution of B's share of the Debtor's assets is consistent with what Judge Shapiro envisioned would transpire in the distribution process here after she decided the Interpleader Action. She states that

> [t]he lien of Rumbaugh's judgment against Beck, attaches to Beck's share of the distribution and must be satisfied to the extent possible.

97 B.R. at 185. Judge Shapiro, in so stating, was, of course, well aware of all aspects of the judgment in the Federal Action, as she held that that judgment precluded R's receiving a distribution of the interpleaded funds. *Id.* She nevertheless perceived no inconsistency between R's obtaining the distribution in this case and the decision in the Federal Action:

> At the time and to the extent the lien is satisfied, Rumbaugh loses legal title to the share of the Debtor Corporation. While it is clear that Rumbaugh retains legal title to the shares to protect his right to recover his judgment, it is equally clear that he may not vitiate the finality of a judgment by refusing to execute on it.

*Id.*

We therefore join Judge Shapiro in rejecting the argument of the Trustee and C that R's "proof of interest" should be rejected because R never expressed a clear election to remain as a shareholder of the Debtor or a creditor of B. Until his judgment against B was satisfied, we do not believe that R had to forfeit his stock in the Debtor. Since it was never satisfied, he never was obliged to make such a choice. The language in the Federal Action decision requiring him to deposit his stock in the Debtor into the court pending execution on his judgment against B was merely a means of preventing R from obtaining a double recovery on his judgment. It was

not meant as a trap to render him susceptible to a scheme of B to prevent him from making a *single* recovery.

We recognize that Judge Shapiro's decision was rendered without her apparently being cognizant of C's claim against B. However, we doubt that the presence of this claim, in light of the facts surrounding it discussed herein, would have changed her views as to how the estate's proceeds should be distributed.

While we believe that we would be justified in simply striking C's "proof of interest," we believe that this result would not be just vis-a-vis B and B's other creditors. It became apparent during the hearing on this matter that B has at least one other judgment creditor, *i.e.,* Bomstein, his unpaid counsel in the State Action. He probably has others. However, none of them have come forward to file a "proof of interest" in B's share of the distribution in this estate. We are inclined to give C a priority in distribution of assets here as to all of B's creditors except R and as to B himself. We of course recognize, as we stated at the outset of this Opinion, at page 629 *supra,* that, given the paucity of funds apparently available for distribution relative to the total of these claims, the only party receiving any funds will be R.

In *Pepper, supra,* 308 U.S. at 306–08, 60 S.Ct. at 245–46, the Court ultimately suggested that subordination of the insider-creditor's claim might be the most appropriate resolution of that matter. *See also, Lockwood, supra,* 14 B.R. at 380–82. We set forth the criteria for applying equitable subordination under 11 U.S.C. § 510(c) of the Bankruptcy Code in *In re Comtec Industries, Inc.,* 91 B.R. 344, 347 (Bankr.E.D. Pa.1988):

> (i) The claimant must have engaged in some type of inequitable conduct....
>
> (ii) The misconduct must have resulted in injury to the creditors of the bankruptcy or conferred an unfair advance on the claimant....
>
> (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Accord, e.g., In re W.L. Bradley Co.,* 75 B.R. 505, 512 (Bankr.E.D.Pa.1987); and *In re Americana Apparel, Inc.,* 55 B.R. 160, 162 (Bankr.E.D.Pa.1985).

We have expressly found that C was guilty of collusion with B to attempt to deprive R of the fruits of his judgment, which is inequitable conduct. This misconduct injured R. Subordination is not inconsistent with the Bankruptcy Code, as there is little guidance therein for determining the priority of proofs of interest. Application of § 510(c) is hence appropriate here.

We will therefore enter an Order directing that the Trustee prepare an Order of Final Distribution which contemplates subordination of C's "proof of interest" to that of R. As per the Trustee's request, we shall stay his actually making distribution until all appeals from this Order and our Orders of May 16, 1989, are exhausted in order to assure that funds are available to compensate his counsel for any further services required.